DC9BKURT1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            S1 12 Cr. 376(RMB)

5    RUDY KURNIAWAN, a/k/a "Dr. Conti,"
     a/k/a "Mr. 47,"
6
                    Defendant.
7
     ------------------------------x
8                                           December 9, 2013
                                            4:04 p.m.
9
     Before:
10
                         HON. RICHARD M. BERMAN,
11
                                            District Judge
12

13                         APPEARANCES

14   PREET BHARARA,
          United States Attorney for the
15        Southern District of New York
     JASON P. HERNANDEZ,
16   JOSEPH FACCIPONTI,
          Assistant United States Attorneys
17
     WESTON, GARROU & MOONEY JEROME MOONEY
18        Attorneys for defendant
     BY:  JEROME MOONEY
19
     VERDIRAMO & VERDIRAMO, P.A.
20        Attorneys for defendant
     BY:  VINCENT S. VERDIRAMO
21
               – also present –
22
     JAMES WYNNE, Special Agent FBI
23   ARIEL PLATT, Paralegal
     ADAM ROESER, Special Agent FBI
24

25

DC9BKURT1                              Trial

1          (In open court; jury present)

2          THE COURT:  While we're waiting, I'm going to ask the

3     jurors to raise their right hands and Christine will give you

4     an oath as to the performance of your duty as jurors.

5          (A jury of 12 and two alternates was impanelled and

6     sworn)

7          THE COURT:  So, jurors, what I'm planning to do is I'm

8     going to give you some preliminary jury instructions and then

9     I'll have one or two more for you before you leave today.  And

10    then I think we'll at least begin with opening statements.  So

11    we're moving along quite nicely.

12         So now that you've been sworn in as jurors, let me

13    tell you briefly about your duty and give you these, what we

14    call preliminary instructions.  It's at the end of the

15    presentation of the evidence, hopefully next week, toward the

16    end of next week, that it will be my responsibility to give you

17    the final charges and it will be your duty to decide from the

18    evidence what the facts are.  You and you alone are the judges

19    or the determiners of the facts in this case.  So you'll hear

20    the evidence, decide what the facts are, and then apply those

21    facts to the law which I will give you.  And that's how you

22    reach your verdict.  In doing so, you must follow the law

23    whether you agree with it or not.

24         As I said before, earlier, and you probably know,

25    under the law a defendant is presumed to be innocent and he or

1    she cannot be found guilty of the crimes charged in the

2    indictment unless a jury, having heard all of the evidence in

3    the case, unanimously decides that the evidence proves his or

4    her guilt beyond a reasonable doubt.

5            In a criminal case, such as this one, the burden of

6    proof remains with the prosecution.  In order for the jury to

7    return a verdict of guilty, the prosecution must prove beyond a

8    reasonable doubt that a defendant is guilty.  A person charged

9    with a crime has absolutely no burden to prove that he or she

10   is not guilty.  And you must not take anything that I saw or do

11   during the trial as indicating what your verdict should be.

12   For example, don't be influenced by my taking notes.  What I

13   write down may have nothing to do with this trial or with what

14   you'll be concerned with at the trial.

15           And, by the way, I have no problem with the jury

16   taking notes.  And, in fact, we'll be handing out pads for you

17   and pens if you need to take notes a little bit later.

18           So let's talk a little bit about evidence and what is

19   not evidence, and then a little bit about burden of proof and

20   then we'll start.  So you decide what the facts are from the

21   evidence that will be presented here in court.  And that

22   evidence may consist of the testimony of witnesses, documents,

23   and other things received into evidence as exhibits and any

24   facts on which the lawyers may agree or stipulate or that I may

25   instruct you to find.

DC9BKURT1                    Trial

1          There's two kinds of evidence:  One is called direct,

2    and the other is called circumstantial evidence.  Direct

3    evidence is testimony by a witness about what that witness

4    personally saw or heard or did, and circumstantial evidence is

5    indirect evidence; that is, it is proof of one or more facts by

6    which you can find another fact.

7          You may consider, by the way, both direct and

8    circumstantial evidence in deciding this case.  The law permits

9    you to give equal weight to both kinds of evidence, or no

10   weight if that's what you determine, because it's up to you to

11   decide how much weight, if any, to give any particular

12   evidence.  As the sole determiners of the facts, you, the

13   jurors, must determine which of the witnesses you believe, what

14   portion of their testimony you accept, and what weight you

15   attach to it.

16         At times during the trial, I may sustain objections to

17   questions asked.  And when that happens, I will not permit the

18   witness to answer; or if the witness, as sometimes happens, has

19   already answered, I will instruct that the answer be stricken

20   from the record and that you, the jurors, disregard it and

21   dismiss it from your minds.

22         In reaching your decision, you may not draw any

23   inference from an unanswered question where an objection has

24   been sustained, nor may you consider testimony that I have

25   ordered stricken from the record if that happens.  The law

DC9BKURT1                        Trial

1    requires that your decision be made solely upon the evidence

2    before you.  The items I exclude from your consideration will

3    be excluded because they are not legally admissible as

4    evidence.

5          The law does not, however, require you to accept all

6    of the evidence that I do admit.  In determining what evidence

7    you will accept, you must make your own evaluation of the

8    testimony given by each of the witnesses and each of the

9    documents presented to you and you determine the weight you

10   choose to give each witness's testimony or to an exhibit.

11   There's no magical formula by which you should evaluate

12   testimony or exhibits.  I will, however, give you some

13   guidelines for determining the credibility of witnesses at the

14   end of the case.

15         At this time, suffice it to say that you bring with

16   you to this courtroom all of the experience and background of

17   your lives.  You do not leave your common sense outside the

18   courtroom.  And so the same types of assessments that you use

19   in everyday dealings are the same assessments or the same type

20   of assessments that you apply in your deliberations.

21         Just a minute on what is not evidence.  The questions

22   and objections of the attorneys are not evidence and neither is

23   any testimony that I may instruct you to disregard.

24         The statements and arguments of the attorneys during

25   any part of the trial are also not evidence.  And, further,

DC9BKURT1                          Trial

1    anything that you may see or hear when the Court is not in

2    session, even if what you see or hear were to be done or said

3    by one of the parties or one of the witnesses, that would not

4    be evidence.  Only what is admitted into evidence here in

5    court, when court is in session and when all of the parties and

6    all of the jurors are present, is competent evidence.

7           So I'm going to have a few more instructions for you.

8    Well, I'll give you one more now.  We talked about this before.

9    We talked about burden of proof.  So now I'll just ask you to

10   remember that this is a criminal case.  The standard by which

11   you will assess the evidence is proof beyond a reasonable

12   doubt, and I will in my final charges or instructions to you

13   instruct you more fully on the meaning of the phrase "burden of

14   proof beyond a reasonable doubt."

15          So just a word about how the trial will unfold, the

16   stages.  First, we'll hear from counsel first for the

17   government and then for the defense.  Opening statements.  They

18   don't have to make opening statements, but they usually do.  An

19   opening statement is not evidence.  It's an outline of what

20   that party intends to prove at trial and it's offered to help

21   you follow the evidence that is presented.

22          Next, the prosecutor will present witnesses and the

23   defense may cross-examine those witnesses, and then the defense

24   may, but does not have to, present witnesses and the prosecutor

25   may cross-examine those witnesses if the defense does call

DC9BKURT1                         Trial

1    witnesses.

2              Possibly, but not necessarily, I may permit the

3    prosecutor to present additional witnesses to rebut the

4    defendant's evidence, if any.  And after that the attorneys

5    will make their closing arguments to summarize and give you

6    their interpretation of what the evidence showed.  The

7    prosecutor will go first, defense counsel second, and then the

8    prosecutor may get a brief reply to the defense.  And like

9    opening statements, closing statements are not evidence.  And

10   after those final closing statements or summations, I will give

11   you instructions on the law and then you will retire to

12   deliberate on your verdict.

13             So please don't make up your mind about what the

14   verdict should be until after I have instructed you on the law

15   at the very end of the case and you have gone to the jury room

16   and you and your fellow jurors have discussed the evidence.  So

17   please keep an open mind until then.  Both parties deserve, and

18   the law requires, that you give them an opportunity to be fully

19   heard.

20             And so now I'll turn to the government for their

21   opening statement.

22             MR. HERNANDEZ:  Your Honor, may we move the podium to

23   the middle of the jury box?

24             THE COURT:  Absolutely.  Can you do it?

25             MR. HERNANDEZ:  I think we can manage.

DC9BKURT1                         Trial

 1          (Pause)

 2          MR. HERNANDEZ:  Judge, none of this is plugged in, so

 3    I can speak loudly.  That's not a problem unless your Honor

 4    wants to take the time to have it connected.

 5          THE COURT:  It's up to you.  If you're comfortable

 6    without it, that's fine.  And, incidentally-- well, we'll talk

 7    about that later.

 8          MR. HERNANDEZ:  May I, your Honor?

 9          THE COURT:  Yes, sure.

10          MR. HERNANDEZ:  This is a case about greed.  For

11    years, Rudy Kurniawan, the defendant, the man who's sitting

12    right there, made millions of dollars selling what he claimed

13    were some of the rarest and most expensive wines in the world.

14    He claimed the wines were very old, very special, and made by

15    famous winemakers in France.  But those were lies.

16          Many of the wines that Kurniawan sold weren't rare

17    wines from famous French winemakers as he said they were, but

18    phony knockoffs that Kurniawan made in his own kitchen in a

19    suburb of Los Angeles.  There, in his house, he took old, empty

20    wine bottles and he made them look like old, rare bottles.

21    Using a computer and a laser printer, Kurniawan created what

22    looked like antique labels from some of the most famous

23    wineries in France, and he put them on empty bottles in his

24    kitchen and then he filled those bottles with cheap wine and he

25    sold them for thousands of dollars each by tricking people into

1    thinking the bottles were very rare and very valuable.

2              Kurniawan did it over and over again, making millions

3    of dollars from his fraud.  But that wasn't enough for Rudy

4    Kurniawan.  Although he made millions from selling his phony

5    rare wines, he wanted even more money to fund his lavish

6    lifestyle, so he told a pack of lies to convince a company to

7    lend him $3 million.  The company was called Fine Art Capital.

8    And Kurniawan lied about how much debt he was in, how much

9    money he spent, and he even lied about his immigration status

10   here in the United States.

11             Ladies and gentlemen, I'm going to take some time now

12   to explain to you how Rudy Kurniawan committed these two

13   frauds.  During this trial, you're going to learn that certain

14   famous wines, often older wines from France, are usually sold

15   at wine auctions.  And you'll learn that their value is

16   determined by a number of factors, such as the prestige of the

17   winery that made the wine, the year or the vintage of the wine,

18   and where the grapes used to make the wine come from.

19             The popularity of these collectible wines have

20   substantially increased in the last 15 years, and as a result

21   collectors are willing to pay top dollar for these wines.  Rudy

22   Kurniawan took advantage of the surge in wine prices by

23   converting his house in Arcadia, California, a suburb of Los

24   Angeles, into a wine counterfeiting laboratory that pumped out

25   case after case of fake bottles that he dreamed up.

1          Kurniawan created an assembly line in his kitchen

2     where bottles passed through different stages of being made

3     into counterfeit bottles.  He even blocked the kitchen window

4     so that no one could see him soaking the labels off of bottles

5     that he put into the sink and so that no one could see what he

6     was doing.  There, in his kitchen, he produced worthless

7     bottles that later he claimed falsely were precious rare wines.

8          After Kurniawan soaked the labels off of the bottles,

9     he used his computer and printer to make fake wine labels.

10    Kurniawan even perfected the process by taking notes on how to

11    make them look more authentic.  Kurniawan had hundreds of

12    custom rubber stamps made that he used to make fake wine corks

13    to dupe anyone who opened one of his bogus wine bottles and

14    examined or looked at the cork.

15         After preparing the fake bottles, Kurniawan blended

16    the fake wine to go into the bottles.  He used old, low-quality

17    French wines and a blend of younger wines from places like

18    California to make the wines that he thought could pass for

19    very expensive, authentic wines.  And to help him keep track of

20    what he was making, he took notes on the actual bottles.  He

21    wrote formulas for mixing up different wines to trick his

22    victims into thinking they were drinking genuine fine wines.

23    And Kurniawan used a classic bait-and-switch scam to gain his

24    victims' trust.  He regularly opened tens of thousands of

25    dollars of wine, authentic wine, for other collectors at

DC9BKURT1                    Opening – Mr. Hernandez

dinners and at tastings.  Kurniawan also paid huge wine bills

worth tens of thousands of dollars at restaurants for other

collectors.

       Kurniawan's victims trusted him so much that when

Kurniawan told collectors that some of his rare wines came from

a quote/unquote magic cellar in Europe, they believed him.

Kurniawan's seeming generosity, however, was just part of the

scam.  The magic cellar was just another lie.  Kurniawan then

sold these fake bottles at wine auctions held here in Manhattan

and in other places, and he also sold fake wine directly to his

own friends.  Over time, however, more and more people were

figuring out that Kurniawan was the source of a huge amount of

fake wine.  People got smart and they figured out that any wine

that came from him had to be looked at very carefully.

       So what did he do?  What did Mr. Kurniawan do?  He

figured out a new way to deceive his victims:  By paying

another person to sell his counterfeit wines for him at

auctions.

       Now, why did he do it?  Greed.  Kurniawan loved living

the high life and he loved the attention that came from having

such a supposedly incredible wine collection, even if it meant

defrauding his own friends and collectors.  He had an

unquenchable thirst for luxury cars, designer clothes, and the

finest food and drink in the world.  And despite raking in

millions from his fake wine sales, it wasn't enough.

DC9BKURT1                     Opening - Mr. Hernandez

1             So in late 2007 and early 2008, Kurniawan concocted

2    new lies and a new fraud.  This time Kurniawan targeted Fine

3    Art Capital.  That's a company here in Manhattan that

4    specializes in giving loans to people who want to secure their

5    loans with art, fine wine, or other collectibles.

6             So in late 2007 Kurniawan applied for, and received, a

7    $3 million loan from Fine Art Capital.  To get that loan,

8    Kurniawan told Fine Art Capital several big lies.  The first

9    lie that Rudy Kurniawan told was about how much debt he had.

10   Kurniawan lied to the tune of millions of dollars of debt that

11   he knew he had, but he hid from Fine Art Capital.

12            Second, Kurniawan lied about how much money he spent

13   each year.  He claimed that he spent about $150,000 a year, but

14   Kurniawan knew that was false because he spent millions of

15   dollars more than that each year.

16            And, third, he lied about his immigration status here

17   in the United States.  He claimed that he was a permanent

18   resident who was applying for a green card.  But he knew that

19   was a lie too, because an immigration court had ordered

20   Kurniawan to self-deport; that is, to leave the country

21   voluntarily in March of 2003.

22            So now I'm going to take some time to explain to you

23   the charges in this case and how we're going to prove to you

24   that Rudy Kurniawan is as guilty as charged.

25            Rudy Kurniawan is charged with committing two crimes:

DC9BKURT1                    Opening – Mr. Hernandez

1    In Count One, he's charged with committing mail fraud by

2    creating, selling, and trying to sell counterfeit wines.  Count

3    Two charges him with committing wire fraud for defrauding Fine

4    Art Capital, by lying to them and omitting important

5    information to them when he applied for a $3 million loan.

6            We are going to prove to you that Rudy Kurniawan was

7    making counterfeit wine with evidence from his house.  As I

8    mentioned previously, you will get to see, and you will get to

9    hold in your hands, thousands of wine labels, corks, stamps and

10   other things that he used to make counterfeit bottles that was

11   retrieved from his home.  Kurniawan's computers, you will see,

12   were full of hundreds of scanned and manipulated images of wine

13   labels.  The images show how Kurniawan airbrushed or

14   Photoshopped aspects of labels so that he could print them at

15   will and use them to deceive buyers to make them think they

16   were buying authentic rare wines.

17           We will show you how Kurniawan turned his computer and

18   printer into a virtual ATM machine that printed out thousand

19   dollar bills in the form of fake wine labels.  The evidence in

20   this trial will also include several of the fake bottles that

21   Kurniawan sold and tried to sell at wine auctions here in

22   Manhattan and in other places.

23           You're also going to hear from several witnesses

24   during this trial, such as the victims who bought Kurniawan's

25   fake wines.  And you're going to hear from some French

DC9BKURT1                    Opening - Mr. Hernandez

 1  winemakers who will tell you why the wines that Kurniawan sold

 2  are fake.  I expect one of those winemakers to tell you that

 3  Kurniawan even tried to sell dozens of bottles of wine that his

 4  winery never even made.  I expect this witness will tell you

 5  that when he confronted the defendant, Rudy Kurniawan, and

 6  asked Kurniawan where he got the obvious fakes from, Kurniawan

 7  told another bald-faced lie.  Kurniawan told the winemaker that

 8  he got the bottles from a collector in Indonesia and that he

 9  gave the winemaker two phone numbers in Indonesia for this

10  supposed winemaker, for this supposed collector.  The numbers,

11  however, were a dead end.  There was no Indonesian collector.

12  The bottles didn't come from Indonesia.  They came from

13  Southern California.  It was just another one of Kurniawan's

14  lies.  It was more of the magic.

15          I also expect a witness from Fine Art Capital to say

16  that Fine Art Capital would not have approved the $3 million

17  loan if Fine Art Capital had known that Rudy Kurniawan was

18  lying.  I expect that witness will tell you that Kurniawan

19  defaulted on the loan and Fine Art Capital had to sell their

20  collateral, the collateral it had, to get its money back.

21          The charges in this case are also going to be

22  supported by documents.  We'll present to you e-mails that show

23  just how desperate Rudy Kurniawan was for money and how he

24  ordered supplies, like wax to seal the tops of wine bottles,

25  for his counterfeiting enterprise.  There are going to be

DC9BKURT1                    Opening - Mr. Hernandez

1    invoices showing Kurniawan's purchases of huge quantities of
2    old, cheap French wines that he used to mix up into his fake
3    bottles.  We're going to show you bank records that showed that
4    he made millions from his scheme and also that he spent
5    millions.
6           Ladies and gentlemen, over the next several days, we
7    are going to be presenting you with all of the evidence that I
8    just mentioned and more.  And at the end of the trial, the case
9    is going to go to you, the jury, to decide whether the
10   government has met its burden of proving the charges beyond a
11   reasonable doubt.  And before I conclude, I'm going to ask you
12   all to do three things.
13          First, is to listen carefully to all of the evidence
14   in this case.  It's going to come in in bits and pieces, but at
15   the end we'll put it altogether for you.
16          Second, listen to Judge Berman's instructions on the
17   law carefully.
18          And, third, use your common sense.  It's the same
19   common sense that you use in your lives every day as New
20   Yorkers.
21          And if you do those three things, you will see that
22   the only verdict that is consistent with the facts and the law
23   is that on both counts of the indictment, Rudy Kurniawan is
24   guilty.
25          Thank you.

1            THE COURT:  Thank you, Counsel.

2            Mr. Mooney.

3            MR. MOONEY:  Thank you, your Honor.

4            Can I move this out of the way?

5            MR. HERNANDEZ:  Sure.

6            MR. MOONEY:  Ladies and gentlemen of the jury,

7    Counsel, if it please the Court, my name is Jerome Mooney and

8    with my co-counsel, Vincent Verdiramo, we represent Rudy

9    Kurniawan.

10            Rudy, stand up, please.  Thank you.

11            We're going to be here with you for a couple of weeks

12   and we'll be talking to you about this case and about the

13   things that went on over a period of time dating back to the

14   early part of 2000.

15            Now, first of all, I know this is a really, really

16   difficult time of year.  There's a lot that's going on in

17   everybody's life.  And I want to let you know that we

18   appreciate very much your being here and your taking this

19   time -- not that you had a lot of choice in it -- but that

20   you're taking this time to come out here and perform this

21   really important task and this role.  It's important.  It's

22   important to everybody.  It's important to all of us here.

23            I know I had a juror talk to me after a trial one

24   time, said, You know, every week I go down and I buy a lottery

25   ticket and I've entered contests throughout the course of my

 1    entire life.  He said, I've never won anything, but I did get

 2    picked for jury duty so I guess I've got a perfect record.  And

 3    I suppose that all of you are just about in that same spot,

 4    sitting here wondering, Oh, boy, why me?  But we do appreciate

 5    it.  What we do can't work without you.  You are the foundation

 6    of our system.  It just can't work.

 7         Now, you're going to hear a lot of evidence over the

 8    course of the next couple of weeks.  The government's going to

 9    start out, first of all, with all of the evidence they've got

10    and it's appropriate that they will, because they have the

11    burden of proof.  We're not going to put a lot of witnesses on

12    because most of the witnesses that will come in, that the

13    government will put on initially, are going to be the same

14    folks that we're going to be asking questions.  So we'll try

15    and give you the information that you need pretty much from

16    that.

17         A lot of the exhibits that you see, the majority of

18    those exhibits, are going to be marked with yellow stickers for

19    the government.  We'll be entering a good number of those.  The

20    government has collected and put together most of the documents

21    that will be helpful.  So don't pay any attention when you see

22    an exhibit as to whether it says it's a prosecution or a

23    defense exhibit.  It's an exhibit.  Once it's entered into

24    evidence, it becomes evidence that you can use once the judge

25    says that's in the case.  Whose sticker happens to be on it

DC9BKURT1                         Opening – Mr. Mooney

1   doesn't mean anything.  Just like who calls the witness doesn't

2   mean anything.  What matters is what's proven in this case and

3   what's not proven in this case.

4           Now, there's only two counts that Mr. Kurniawan is

5   charged with, two things that we're going to face.  The second

6   one is the so-called fraud against Fine Art Capital.  And I

7   just want to mention a little bit about what I think you're

8   going to learn with regard to that.  Yes, he went down and got

9   a $3 million loan.  He got a $3 million loan from Fine Art

10  Capital because he had taxes that he needed to pay.  Not

11  exactly terribly greedy.

12          And you're also going to hear that in the course of

13  getting his $3 million loan-- and, by the way, he only gets two

14  and a half million of it.  They hold back half a million

15  against cost and fees.  So out of the two and a half million,

16  for the two and a half million dollars that he actually gets on

17  the loan, he pledges security which you're going to hear that

18  Fine Art Capital valued at $6.8 million.  So he gives them $6.8

19  million worth of property for the purposes of getting two and a

20  half million dollars that he can then use for some of the other

21  expenses and things that he's got.  I suppose that might be a

22  fraudulent scheme, but I think it's important for you to

23  remember that.  Keep that in mind when you see it.

24          Rudy is a young man, he's of Chinese descent, born in

25  Indonesia.  That's important because as a young Chinese man in

1    Indonesia, he starts life as kind of an outsider.  It's very

2    difficult to be a Chinese person in that country, and his

3    family has always had certain problems.  Even though they've

4    always been successful, they've always been outsiders in

5    Indonesia.  So he grew up being an outsider.

6             He came to the United States to get an education, got

7    his education, and in the course of what he was doing here

8    became acquainted with fine wines.  And wine is something which

9    is meant to be drunk.  It's designed.  It's a biological

10    product that's created for the purposes of being consumed.

11    Because unlike a Picasso that you may hang up on your wall and

12    sit back and enjoy, it's not going to last forever.  It needs

13    to be consumed and it needs to be consumed within a certain

14    period of time.

15             Now, some of us have better palates with regard to

16    this than others.  It turns out that Rudy had a very good

17    palate.  As he started to experience and taste wines, he found

18    out that he could really distinguish between different tastes,

19    that he could really appreciate the differences in wines.  You

20    hear about some of those people that can taste a wine and they

21    can tell you where it came from and tell you what the year is

22    and tell you all about what's in the bottle.  And he's one of

23    those people.  I'm not.  I know some of it, but I can't do

24    that.  But he can.

25             So because he had a pretty good palate, he suddenly

DC9BKURT1                    Opening - Mr. Mooney

1    starts getting introduced to other people, people who are very

2    much into this whole thing of drinking and consuming and having

3    these very, very fine wines.

4         Now, he comes from a wealthy family.  So he came over

5    here, he's got money, but he started to meet these people and

6    he wants to belong.  He's always wanted to belong.  Now here's

7    this group of people that are enjoying something that he really

8    likes too.

9         So he starts to be able to go to some places where

10   these people are.  He starts to be able to taste and drink some

11   of the wines that they've got.  And we're talking about some of

12   the richest people in the world because some of these wines

13   cost a great deal of money.  If you're going to spend a

14   thousand dollars on something, a bottle of wine, you open it

15   up, you pour it and drink it, that's not normal people.  Those

16   are people with lots of money.  And he meets these people.

17   Now, they're richer than he is, they're older than he is, and

18   for the most part they're more successful than he is.  He's

19   just a young man.  He comes from a rich family.  He's graduated

20   from college.

21        But he wants to be part of what they are, so he starts

22   to go places where he can be with them.  He starts to do things

23   to try to figure out how he can be a part of this group.

24   You'll hear that he takes these people to fancy, expensive

25   restaurants and he buys expensive wines for them to drink and

1    he pays for the meal.  Pays for the whole meal for some of the

2    richest people on earth.  And you're going to hear that they're

3    not buying him dinner.  He's buying them dinner.  Even though

4    they're wealthy billionaires, he's buying them dinner.  Why is

5    he doing that?  He wants to be part of what's going on.

6          He also then starts to get involved in some of the

7    auctions and things that are going on with regards to the

8    buying of the product, and he becomes known as the most

9    prolific buyer of wines that are out there.  And he buys not

10   hundreds of dollars' worth, not thousands of dollars' worth,

11   but millions of dollars in wine.  That's what he buys.  And

12   he's buying it almost as quick as he can get his hands on it.

13   He's going to the auctions and getting it because that starts

14   to make him maybe -- maybe if he has enough, maybe if he can

15   get this all together, maybe they'll let him be part of this

16   club.  Maybe he'll be in.  Maybe he'll be the friend that

17   Mr. Hernandez says that he is to these other people.  Maybe.

18   Maybe these older, richer people that he's buying all these

19   dinners for and spending all this money on, maybe they will let

20   him be a friend if he rises up to that level.

21          But you're going to hear something else about the wine

22   market.  You're going to hear that in the wine market, there's

23   a lot of counterfeits and there's a lot of alterations.  Old

24   bottles get bad labels, labels get replaced, people replace

25   labels, people uncork them when they shouldn't, they recork

them.  Because for most of the time it was just really about

drinking it.  And you're going to hear that that goes on.  And

you're going to hear even from the people that come in from the

French chateaus, yeah, there's an awful lot of bottles out

there that are counterfeit.  And if you're out there buying a

lot, if you're buying a lot of wine, you're going to buy a lot

of counterfeits.  It's just going to happen.

            Now, Mr. Kurniawan, Rudy, who first starts getting

involved in any capacity in wines in the early 2000s, starts

to-- he's going to tell people, Oh, I know the difference, I

can tell.  And probably when it comes to opening a bottle and

tasting it, he can.  But you're going to have experts that are

going to come in here and these experts are going to talk to

you about all of these bottles.  And just wait and see how much

time and energy some of these people have put into it and how

complicated and difficult it is sometimes to figure out all of

the differences.

            So, what Mr. Hernandez told you to do, I'm going to

ask you to do as well.  Pay attention.  Pay close attention to

what's going on and listen to things.  Try not to reach any

quick conclusions, because you need to get the whole big

picture of what's happening before you can really start to put

it in the right perspective, before you can see that this poor

guy ends up being the one who suddenly gets blamed for

everything.  When people get embarrassed, when all of this

DC9BKURT1                    Opening – Mr. Mooney

1    begins to come out in the press, when people start making a big

2    thing about the fact of, oh, look at all these counterfeits.

3    Yes, there are lots and lots of counterfeits.  He bought

4    counterfeits, he sold counterfeits.  Everybody else bought

5    counterfeits and sold counterfeits.  But because he's not one

6    of the insiders, we're here.  And he's the one that some of

7    these people are going to want you to believe is responsible

8    for all of the awful, horrible things that have happened with

9    regards to the wine market.

10          And I think at the end of the case you're going to be

11   able to look at it and you're going to be able to see it and

12   you're going to be able to see that everything that has been

13   put together with regards to this so-called case is just a

14   house of cards and it doesn't really stand up.

15          I'm going to thank you now.  I don't get a chance-- we

16   don't get a chance to address you now until after all of the

17   evidence is in and we get to the end of the case.

18          I want to mention one other thing.  We'll, a lot of

19   times as we go on, I know this is going to get really boring

20   for you and you're going to hear us ask a lot of questions

21   sometimes and say, Why on earth is he asking that question?  We

22   certainly know that already.

23          One of the really frustrating things that happens in a

24   trial, and it's frustrating for both of us, the frustrating

25   part for you guys is you're sitting there, the witness is up

1    there and the witness is talking about something and you want

2    to know something from that witness.  Well, you don't get to

3    raise your hand and say, Well, what about this?  And that's

4    going to be really frustrating for you.

5          I'm going to tell you right now that's going to be

6    really, really frustrating.  But you know what?  It's really,

7    really frustrating for us, too, because we're sitting here

8    thinking what's that question that they want answered?  So

9    we're trying to figure that out and we're trying to remember

10   what it is.

11         Sometimes we'll get it right.  Sometimes we'll think

12   about it and we'll ask the question and we'll get you the

13   information that you need.  Sometimes we won't and the witness

14   will be done and the witness will be gone and you'll be mad at

15   us because we never asked the question.

16         So I'm going to apologize for that right now.  And

17   especially because we'll probably ask about 15 other questions

18   that you wish we didn't ask because you say that's obvious.

19   because we're asking all those questions because we're trying

20   to get to the one that we think that's the one that you're

21   really trying to hear about.

22         So let me apologize for all of those sorts of things

23   that are going to happen right now.  I mean I could just tell

24   you that's going to happen.  It's frustrating for all of us.

25   We'll do the best that we can to try to figure out what those

1    questions are.  We'll do our best to try to ask those

2    questions.  We'll do the best that we can to try to get you

3    that information.

4            Then, when all of the evidence is in and we're done,

5    we'll get a chance to do this again.  And at that point in

6    time, I can try to tie it altogether and bring it together so

7    you can at least see what I think I saw and hopefully that will

8    be the same thing that you will see.

9            So, once again, thank you very much.  Thank you.

10            THE COURT:  Okay, ladies and gentlemen.  I'm going to

11    let you go in a couple of minutes.  I want to give you some

12    instructions and also about conducting yourselves as jurors and

13    also about tomorrow, because starting tomorrow we're going to

14    do all this trial in Room 12D.  So it's a smaller courtroom.

15    It's a little warmer, in fact, and I see people are happy about

16    that.  It's 12D.

17            So here are the conduct instructions.  First, I ask

18    that you not talk to each other about this case or about anyone

19    who has anything to do to do with it until the very end of the

20    case when you go to the jury room to decide or to deliberate on

21    your verdict.

22            Second, I asked you not to talk with anyone else about

23    the case or about anyone who has anything to do with it until

24    the trial has ended and you have been discharged as jurors.

25            And, by the way, when I say "talk," I mean e-mailing,

texting, Tweeting, blogging, et cetera.  Not just verbal

communication, but all forms of communications.  I'm asking you

not to do that.  I'm referring to any type of communication in

any form, including Facebook, MySpace, Twitter, et cetera.

         Additionally, I ask you not to remain in the presence

of other persons who may be discussing this case either

face-to-face, orally, or on-line.  And anyone else includes

members of your family and your friends and includes social

media.  So you may say to your family or your friends that

you're a juror in a case, but don't tell them anything else

about the case until after you have been discharged by me.

         Third, don't let anyone talk -- as broadly defined a

minute ago -- to you about the case or about anyone who has

anything to do with it.  And if someone were to try and talk to

you about the case, please report that to Christine or me

immediately.

         In this regard I should mention that the attorneys and

other persons -- witnesses, et cetera -- involved in the case

are not supposed to talk to jurors, even to offer a friendly

greeting.  So if you happen to run into one of them outside the

courtroom, they will-- and properly so-- ignore you.  Please

don't take offense.  They're only acting properly by doing

that.

         Fourth, don't read any news or internet stories or

articles or blogs or anything or listen to any radio or TV or

DC9BKURT1                    Opening – Mr. Mooney

1   internet reports about the case or about anyone who has

2   anything to do with it.

3          And, fifth, do not do any type of research or any type

4   of investigation about the case on your own.

5          The bottom line is that the parties are entitled to

6   have you personally render a verdict in this case on the basis

7   of your independent evaluation of the evidence presented in the

8   courtroom.  And obviously speaking to others about the case,

9   including your family members, before you deliberate among

10  yourselves or exposing yourself to evidence outside the

11  courtroom in any way would compromise your jury service and

12  fairness to the parties.

13         So we made very good progress today.  We're going to

14  stop for today.  Remember, we start early.  We start in trial

15  on the 12th floor, Courtroom D, 12D, at 9 a.m.  So we'd like

16  you to be here by 8:45.  We'll have coffee and tea and some

17  bagels in the jury room.  So 8:45 in Room 12D.

18         Thanks for a great day and we're off to an excellent

19  start.

20         THE DEPUTY CLERK:  You can leave your notes face down

21  on the chair.

22         THE COURT:  Yes, if you leave your notes behind, we'll

23  safeguard them overnight and make sure you get them back

24  tomorrow.

25         (Jury excused)

DC9BKURT1                        Opening - Mr. Mooney

1              (In open court; jury not present)

2              THE COURT:  Okay, folks.  Good start.  We'll see you

3       at around 8:45, if that's okay.

4              MR. HERNANDEZ:  Judge, just a couple of things before

5       we start in the morning.

6              THE COURT:  Yes.

7              MR. HERNANDEZ:  Obviously Jim Wynne, the case agent,

8       is going to be sitting at counsel table.  I assume that's okay,

9       given normal practice.

10             And then Michael Egan, who's our expert, we'd like to

11      be able to sit through the trial, listen to the evidence, and

12      then testify at the end.

13             THE COURT:  I have no problem with that.

14             MR. MOONEY:  We would like all other witnesses to be

15      excluded, though, your Honor.

16             MR. HERNANDEZ:  We told all other witnesses not to

17      attend and watch.  Now, some of the witnesses have asked if

18      they could watch the trial after they've testified.

19             THE COURT:  That's fine with me.

20             MR. MOONEY:  I think after they've been released.

21             MR. HERNANDEZ:  Right.

22             MR. MOONEY:  There are some of the witnesses -- what I

23      anticipate is we're going to ask that they not be released

24      because there may be things that we may need to call them back

25      for later.

DC9BKURT1                    Opening – Mr. Mooney

1              THE COURT:  Okay.

2              MR. MOONEY:  A good example right now would be Truly

3    Hardy.  We'll try to get in what we can, but there may be a

4    possibility that we may need him back.

5              MR. HERNANDEZ:  That's definitely something that we

6    should talk about.  We're calling Truly Hardy early --

7              MR. MOONEY:  Oh, to get him out of here?  Okay.

8              MR. HERNANDEZ:  Well, we're not getting him out.  He's

9    going to an auction in Hong Kong.

10             MR. MOONEY:  Well, that's out.  Hong Kong is very out.

11             THE COURT:  I think you guys will work that out

12   yourselves.  If there's any problem, you'll let me know.  I

13   think you'll be able to work it out.

14             MR. MOONEY:  We'll figure it out.  We can go to Hong

15   Kong.

16             THE COURT:  All right.  We'll see you tomorrow.

17             MR. MOONEY:  Thank you, your Honor.

18             (Adjourned to December 10, 2013, at 9:00 a.m.)

19

20

21

22

23

24

25