UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -- v. --

RUDY KURNIAWAN,
   a/k/a "Dr. Conti,"
   a/k/a "Mr. 47,"

      Defendant.

S1 12 Cr. 376 (RMB)

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

JASON P. HERNANDEZ
JOSEPH P. FACCIPONTI
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

I. Summary of the Offenses ................................................................................................ 2

II. Applicable Law ............................................................................................................. 2

III. The Government's Calculation of the Advisory Sentencing Range .......................................... 3

IV. The Court Should Impose a Sentence Within the Advisory Guideline Range .......................... 5

    A. Kurniawan Made Tens of Millions of Dollars Selling Fake Wine and He

      Attempted to Sell Tens of Millions More ......................................................................... 5

        1. Applicable Law. ........................................................................................... 5

        2. Actual Loss ................................................................................................ 6

        3. Intended Loss ............................................................................................. 8

    B. The Scheme to Defraud Fine Art Capital Merits Punishment, Even Though

      There Was No Loss ....................................................................................................... 10

    C. The Pertinent Sentencing Factors Support a Sentence Within the

      Guideline Range ........................................................................................................... 11

V. Kurniawan's Argument for A Sentence of "Time Served" Are Unpersuasive ...................... 13

    A. Kurniawan Should Receive No Leniency for Accepting Responsibility for

      His Crimes or For His Justifications for Making and Selling Counterfeit Wine ............ 13

    B. The Court Should Reject Kurniawan's Other Arguments in Mitigation Because

      They Are Irrelevant and/or Inapposite ......................................................................... 16

VI. The Court Should Impose A Forfeiture Money Judgment and Order Restitution ................. 17

Conclusion ....................................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -- v. --

RUDY KURNIAWAN,
  a/k/a "Dr. Conti,"
  a/k/a "Mr. 47,"

      Defendant.

S1 12 Cr. 376 (RMB)

## GOVERNMENT'S SENTENCING MEMORANDUM

For more than a decade, Rudy Kurniawan was the biggest and most successful wine

counterfeiter in the world. Kurniawan sold tens of millions of dollars of purportedly rare French

wine that he made in his kitchen and he attempted to sell tens of millions more. If not for his

arrest a little more than two years ago, he would almost certainly still be making and selling fake

wines today. Kurniawan's thirst for a life of luxury and status led him to not only sell counterfeit

wine – often to his own friends – but to also defraud Fine Art Capital in connection with a $3

million loan. Kurniawan's crimes are serious and in no way are they mitigated by the fact that

his victims are wealthy, that Kurniawan was skilled at duping unsuspecting wine lovers, or that

he did it just to "fit in." Rich or poor, everyone is entitled to get what they paid for and no one is

entitled to cheat another person out of their money, no matter what their motive may be.

Accordingly, the Government respectfully requests that the Court impose a sentence within the

advisory sentencing guideline range of 135-168 months' imprisonment.

1

## I. Summary of Kurniawan's Offenses

The Court is familiar with the facts of this case from the trial held in this matter December 9 to 18, 2013. In the interests of brevity, the Government will not recite all of the facts of this case in this memorandum. Instead, this memorandum will focus on the facts most pertinent to sentencing.

Rudy Kurniawan was convicted by a jury of his peers after eight days of trial before Your Honor of one count of wire fraud for creating and selling counterfeit wines and one count of wire fraud for defrauding Fine Art Capital in connection with a $3 million loan. The evidence at trial showed that Kurniawan sold millions of dollars of counterfeit wines that Kurniawan created in his home in Arcadia, California. The evidence also showed that Kurniawan lied to Fine Art Capital to get a $3 million loan. Kurniawan lied about his immigration status in the United States, he intentionally understated his personal debt, and he intentionally understated his annual expenses. The evidence on both counts was overwhelming and the jury returned its verdict in under 90 minutes.

## II. Applicable Law

The United States Sentencing Guidelines ("USSG" or "Guidelines") still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005) and its progeny. Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Id.* at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that

"should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . " *id*. § 3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *id*. § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," *id*. § 3553(a)(2)(C); "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," *id*. § 3553(a)(2)(D); "the kinds of sentences available," *id*. § 3553(a)(3); the Guidelines range itself, *id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

### III.  The Government's Calculation of the Advisory Sentencing Range

The Government's Guideline calculation is as follows.

The applicable Guidelines manual is the version in effect as of November 1, 2013.

**Count One – Scheme to Create and Sell Counterfeit Wine**

- USSG § 2B1.1 is used to determine the offense level.

- The base offense level is seven pursuant to USSG § 2B1.1(a)(1) because the offense of conviction has a statutory maximum of 20 years or more.

3

- The offense level is increased by 22 pursuant to USSG § 2B1.1(b)(1)(L) because the offense involved an intended and/or actual loss of more than $20,000,000 but not more than $50,000,000.

- The offense level is increased by two pursuant to USSG § 2B1.1(b)(2)(A) because the offense involved 10 or more victims.

- The offense level is increased by two pursuant to USSG § 2B1.1(b)(10) because the offense involved sophisticated means.

Accordingly, the offense level for Count One is 33.

**Count Two – Scheme to Defraud Fine Art Capital**

- USSG § 2B1.1 is used to determine the offense level.

- The base offense level is seven pursuant to USSG § 2B1.1(a)(1) because the offense of conviction has a statutory maximum of 20 years or more.

- The offense level is increased by sixteen pursuant to USSG § 2B1.1(b)(1)(I) because the offense involved a loss of more than $1,000,000 but not more than $2,500,000.

- The offense level is increased by two pursuant to USSG § 2B1.1(b)(16)(A) because the defendant derived more than $1,000,000 in gross receipts from a financial institution as a result of the offense.

- The sixteen level increase pursuant to USSG § 2B1.1(b)(1)(I) is offset entirely, however, because the victim was made whole by the time of sentencing by the sale of the collateral posted for the loan. *See* § 2B1.1 App. Note 3(E)(ii) (discussing Credits Against Loss).

Accordingly, the offense level for Count Two is 25.

**Grouping Analysis**

Counts One and Two are grouped pursuant to USSG § 3D1.2(d) because the offense level is determined largely on the basis of the total amount of loss. The offense level for Count One is thus used to determine the applicable offense level, which is a level 33.

**Criminal History Category**

The defendant has no criminal history points, so his Criminal History Category is I.

4

**Sentencing Range**

In accordance with the above, Kurniawan's advisory Guideline sentencing range is 135-168 months' imprisonment. At offense level 33, Section 5E1.2 of the Guidelines recommends a fine of $17,500 to $175,000.

## IV. The Court Should Impose a Sentence Within the Advisory Guideline Range

The Court should impose a substantial sentence on Rudy Kurniawan, a sentence within the Guideline range, because Kurniawan's crimes were very serious and it will provide adequate general and specific deterrence. Kurniawan's counterfeiting activities caused tens of millions of dollars of harm and he intended to cause even more. Not only did he dupe many victims out of millions of dollars, the effects of this crime are likely to be felt for decades as fake bottles of wine made by Kurniawan continue to exchange hands through wine auctions and direct sales.

### A. Kurniawan Made Tens of Millions of Dollars Selling Fake Wine and Attempted to Sell Tens of Millions More

For more than ten years, Rudy Kurniawan produced, in assembly line fashion, tens of millions of dollars of the finest and rarest wines in the world. The scheme made Kurniawan rich and he flaunted that wealth with extravagant purchases of authentic wine, luxury cars, a Beverly Hills mansion, flights on private jets, designer watches and clothing, fine art, and much more. Kurniawan says he made fake wines to fit in with the .1%, but it was Kurniawan's lust for money and attention that truly drove him.

#### 1. Applicable Law

"The court need only make a reasonable estimation of loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1

cmt. 3(C).  The court must use the greater of actual loss and intended loss (U.S.S.G. 2B1.1 cmt. 3(A)), and can combine the two in determine the total loss amount.  *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000).

In the context of counterfeit check prosecutions, courts have held that unused and/or blank counterfeit checks can be used to calculate intended loss.  *See United States v. Osborne*, 332 F.3d 1307, 1313 (10th Cir. 2003) (affirming district court's use of the face value of authentic checks stolen in counterfeit check scheme to determine intended loss). Courts have also held in check counterfeiting cases that it is reasonable to infer that a defendant would have continued making counterfeit checks until apprehended.  *United States v. Tate*, No. 03-3498, 136 Fed. Appx. 821, 826 (6th Cir. 2005) (unreported decision) ("It was reasonable to infer that the Tates intended to continue, and would have continued negotiating counterfeit checks in the same manner if they had not been apprehended.").  Finally, loss can be calculated based upon the presence of counterfeiting materials and paraphernalia in a defendant's home, among other methods.  *See United States v. Robbio*, 186 F.3d 37, 44 (1st Cir. 1999) (holding that a district court might calculate intended loss in a counterfeit check scheme based on, among other things, blank check paper found in the defendant's basement).

### 2.  Actual Loss

Kurniawan was a prolific wine counterfeiter.  To date, the Government has been able to establish that Kurniawan sold at least $20,730,000 in fake wine that has not been returned for a refund.  That total, however, is very conservative.  The total is certainly several millions of dollars higher.  There are three primary reasons why the total is greater than $20,730,000.  *First*, there are at least two of Kurniawan's victims who each purchased several millions of dollars of

rare wine from Kurniawan who have not provided the Government with any assessment or

estimate of the fake wines they bought from Kurniawan. Based on their purchases of

purportedly rare wines, their likely losses, if added to the known losses of $20,730,000, would

likely push the total above $30,000,000. *Second*, Kurniawan sold massive amounts of wine in

auctions, private sales, and direct sales. Kurniawan sometimes swapped wines with other

collectors. Kurniawan, however, did not keep coherent records of his wine sales, which makes it

difficult to identify all of his victims. And *third*, over the course of the last decade, many of the

fakes that Kurniawan sold have been consumed, which makes it impossible to physically

examine those wines for authenticity.

Despite the challenges in calculating the exact loss amount, there is no question that

Kurniawan sold approximately $20,730,000 of fake wine to the following:

- As the Court heard at trial from Susan Twellman, David Doyle purchased millions of dollars of wine from Kurniawan, including fake magnums of Domaine Ponsot that were admitted into evidence at trial. Mr. Doyle estimates that Kurniawan sold him at least $8 million of counterfeit wine.[1]

- Michael Egan, one of the Government's wine authentication experts, examined Michael Fascitelli's cellar and estimated that Mr. Fascitelli purchased approximately $5,500,000 of counterfeit wine from Kurniawan. Mr. Egan summarized his findings in a detailed report.

- William Koch, who testified at trial, had Mr. Egan examine his cellar, too. Mr. Egan estimates that Kurniawan sold Mr. Koch approximately $2,230,000 in counterfeit wine. Mr. Egan summarized his findings in a detailed report.

---

[1] In his sentencing Memorandum, Kurniawan states that "many, but not all" of the wines he sold to Mr. Doyle in June 2007 were fake. (Kurniawan Sent. Mem. at 15). Mr. Doyle, however, believes that mostly all of the bottles Kurniawan sold him were fakes. If helpful to the Court, the Government can provide additional information about the bottles sold to Mr. Doyle at the sentencing hearing.

- Kurniawan used one of his brother's names, Dar Saputra, to sell approximately $3,000,000 in fake wine to Mission Fine Wines in Staten Island, New York.

- Kurniawan, pretending to be someone named "Leny Tan," sold approximately $2,000,000 in fake wines to Brian Devine.

### 3. Intended Loss

Conservatively, the intended loss in this case is at least $35,047,242, although a number much higher could also be considered conservative. The following six transactions, in which Kurniawan either attempted to sell counterfeit wine to a victim or successfully sold counterfeit wine and the victim returned it for refund, total $35,047,242:

- On or about April 21, 2008, Kurniawan attempted to sell two large parcels of extraordinarily rare wine to a potential victim. The purported value of the wines was $53,500,500, but Kurniawan told his putative victim that he was willing to "wrap up" the deal for $30 million. As set forth in the attached Affidavit of Allan Frischman, a wine authentication expert retained by the Government, all or nearly all of those wines were likely fakes. (Allan Frischman Affid. Ex. A, ¶ 7). A copy of the email in which Kurniawan proposes the $30 million wine sale is attached as Exhibit 3 to the Frischman Affidavit.

- In or about June 2008, Kurniawan attempted to consign approximately $2,613,860 of counterfeit wine to Hart Davis Hart Wine Company ("HDH"), in Chicago, Illinois. The consignment was rejected by Frischman and others at HDH. (*Id*. ¶¶ 3-6).

- The Government established at trial that Kurniawan consigned, through Antonio Castanos, approximately $736,500 in counterfeit wine for a wine auction in London in February 2012 that was ultimately withdrawn from the auction.

- The Government also established at trial that Kurniawan consigned fake wines from Domaine Ponsot worth an estimated $602,000 to an auction in April 2008.

- Several victims who bought fake wine retuned the fakes to Acker Merrall & Condit for a refund or a credit. One example is Donald Stott, who returned approximately $651,182 in fake wines consigned by Kurniawan.

- Another example is Edward Milstein who retuned approximately $443,700 in counterfeit wines to Acker Merrall & Condit.

In total, the six attempted consignments and/or sales described above total approximately $35,047,242. That total, however, does not account for every bottle of fake wine sold by Kurniawan that was returned. Many other victims were defrauded in smaller, yet still substantial, amounts. The Government has provided a list of all wine returns from Kurniawan's consignments to Acker Merrall & Condit to the Probation Office.

In addition to the six attempted consignments and/or sales described above, the Court should consider the massive wine counterfeiting operation that was discovered in Kurniawan's home when calculating the intended loss. As the Court saw during the trial, Kurniawan kept thousands of wine labels for very rare and expensive wines in his home. The Government created a spreadsheet that attempts to account for the wines that Kurniawan appeared to counterfeit most frequently, along with the vintage for each wine. While the list is not exhaustive, it is representative. It is attached hereto as Exhibit B. Kurniawan's computers were also full of altered digital scans of wine labels. He even had wine bottles with notes and formulas for the creation of fake wines. In currency counterfeiting cases, Courts have looked to evidence seized in those counterfeiting operations to calculate intended loss. *See Osborne*, 332 F.3d at 1313; *Tate*, No. 03-3498, 136 Fed. Appx. at 826; *Robbio*, 186 F.3d at 44. The same principles underlying the loss calculation in those cases apply here.

As set forth in the Affidavit of wine authentication expert Allan Frischman, it his expert opinion that Kurniawan stockpiled counterfeiting supplies to make and sell counterfeit wines. (Allan Frischman Affid. Ex. A, ¶ 7). While it is difficult to precisely calculate how much Kurniawan could have received from the counterfeit wines made in his home with the materials that were seized, there is no doubt that Kurniawan could have produced tens of millions of

9

dollars of fake wine from his counterfeiting stockpile. To illustrate this point, the Government counted the number of labels from just 18 representative exhibits introduced at trial. An inventory of those exhibits is attached hereto as Exhibit C. As that exhibit shows, Kurniawan had 43 labels for 1945 Domaine de la Romanee-Conti Romanee-Conti, a wine discussed thoroughly at trial, in addition to thousands of other labels for rare wines that, if authentic, are worth thousands of dollars each. In short, Kurniawan had the capacity and the intent to make as much counterfeit wine as he could sell, so the Court should consider the evidence from Kurniawan's home when calculating the intended loss.

### B. The Scheme to Defraud Fine Art Capital Merits Punishment, Even Though There Was No Loss

In addition to counterfeiting millions of dollars of wine, Kurniawan told three material lies to Fine Art Capital to induce them to make Kurniawan a $3 million loan that they would never have made if they knew the truth about Kurniawan's immigration status and financial condition. As the Court is aware, Fine Art Capital ultimately suffered no monetary loss because the collateral, in the form of works of art, exceeded the value of the loan. The Guidelines explicitly take that into consideration and the Guideline calculation for Count Two does not add any additional points for intended or actual loss. *See* USSG § 2B1.1 App. Note 3(E)(ii) (discussing Credits Against Loss).

Even though Fine Art Capital did not suffer a loss as a result of Kurniawan's scheme, the Court should still give Kurniawan's conduct consideration when imposing sentence. As Barbara Chu, the Fine Art Capital executive who testified at trial explained, it was by no means a certainty that Fine Art Capital would have been made whole by the collateral, because changes in the economy or in the fickle art market could have resulted in lower sales prices for the

10

collateral. (*See* Testimony of Barbara Chu, Trial Tr. 12/10/13 at 75-76. 104-7). Kurniawan simply got lucky that the art he posted as collateral was in vogue at the time and that the economy was strong enough to generate sales that covered the loan.

While the sale of the collateral is a mitigating factor that the Court should consider, it is counterbalanced by Kurniawan's egregious conduct. The lies that Kurniawan told to Fine Art Capital were blatant and intentionally calculated to induce Fine Art Capital to make a loan that Kurniawan knew it otherwise would not make. Kurniawan's sentencing memorandum reiterates his argument from trial that he never received the final notice from the immigration court that his appeal had been denied. Even assuming, *arguendo*, the dubious proposition that Kurniawan did not know that he had exhausted his immigration appeals when he applied for the loan, Kurniawan has no defense to lying to Fine Art Capital about his finances. Kurniawan brazenly lied to Fine Art Capital about his financial liabilities and his expenses, understating both by millions of dollars.

Kurniawan's criminal conduct cannot be excused because his victim was lucky and was made whole. If that was the case, defendants could routinely escape punishment, or even prosecution, for intentional criminal conduct.

### C. The Pertinent Sentencing Factors Support a Sentence within the Guideline Range

On balance, the applicable sentencing factors – particularly the seriousness of the offense, the need to afford adequate general and specific deterrence, and the characteristics of the defendant – support imposing a Guideline sentence.

Kurniawan's scheme was long-lived and it caused substantial economic harm. Kurniawan sold millions of dollars of wine that were actually worthless. Buyers who bought wine to drink

11

did not get what they bargained for and those who bought wine as an investment have suffered total losses. Kurniawan's fakes, which can be difficult to identify, will also be in circulation for decades to come. The impact of his crime will thus linger long after Kurniawan has finished serving his sentence. As the evidence has shown, Kurniawan was always looking for opportunities to sell more fake wine and he nearly sold more than $53 million worth of fake wine to one buyer. (Allan Frischman Affid. Ex. A, ¶ 7). The seriousness of the offense is also compounded by the fact that the scheme went on for more than a decade.

The need for adequate general and specific deterrence also weighs in favor of a Guideline sentence. With respect to general deterrence, as Kurniawan himself points out, there are other wine counterfeiters in the world besides Kurniawan, and they are rarely caught. A sentence within the applicable Guideline range would help send the message to other wine counterfeiters that cheating others out of their money is a serious crime that will result in substantial jail time. A Guideline sentence would also serve to deter Kurniawan from committing this crime again. Kurniawan says in his sentencing memorandum that he created counterfeit wines to fit in with a certain wealthy crowd of wine collectors and that he enjoyed the attention that came with it. Those temptations will again be waiting for Kurniawan when he is released from the custody of the Bureau of Prisons. A substantial sentence is necessary to adequately deter Kurniawan from resorting to wine counterfeiting after his release.

Finally, Kurniawan's personal background also weighs in favor of a Guideline sentence. Kurniawan came to this country as a young man to receive an education, which he eventually did, graduating from college with a degree in accounting. He has a loving and supportive mother and brothers. He claims that his family is wealthy. In short, Kurniawan had advantages in life

that many do not. He chose, however, to throw much of it away by choice. Kurniawan chose, for example, to flout an order to leave the country. He chose make and sell counterfeit wines so that he could live like a king. And he chose to defraud Fine Art Capital. These were crimes motivated by greed. They were committed by someone who already had a comfortable station in life and a bright future. While Kurniawan cites his immigrant background as a mitigating factor, a fairer assessment of the full picture is that Kurniawan's background does not merit leniency from the Court.

## V. Kurniawan's Argument for A Sentence of "Time Served" Are Unpersuasive

Kurniawan argues that he should receive a sentence of "time served." Such a sentence would be unjust because the punishment would not fit the crime. In addition, for the reasons explained below, the relevant mitigating factors in this case do not merit the extraordinarily lenient sentence of time served.

### A. Kurniawan Should Receive No Leniency for Accepting Responsibility for His Crimes or For His Justifications for Making and Selling Counterfeit Wine

Counsel for Kurniawan argues that Kurniawan is entitled to a two point reduction for accepting responsibility for Kurniawan's crimes. (Kurniawan Sent. Mem. at 22-23). Counsel cites Kurniawan's April 25, 2014 letter (the "April 25th Letter") addressed to Your Honor in which Kurniawan admits that he made and sold counterfeit wines.[2] In that letter, Kurniawan also says that he's sorry for what he did. Kurniawan does not express any remorse for having

---

[2] Counsel for Kurniawan, Jerome Mooney, Esq., submitted a copy of the letter to the Probation Office and the Government in an email requesting that the letter be included with the Pre-Sentence Investigation Report ("PSR"). Mr. Mooney further stated that he wanted the letter filed with the PSR because information in the PSR is entitled to greater protections and that he would not be publicly filing the letter.

defrauded Fine Art Capital, however. Kurniawan's sentencing memorandum echoes Kurniawan's purported remorse for cheating his fellow wine lovers. The Court, however, should not credit Kurniawan's professed remorse either in the Guideline calculation or as a Section 3553(a) factor.

As an initial matter, Kurniawan's April 25th Letter is not in the public record, and if the Court intends to rely upon it at sentencing, it should be made part of the public record. There is nothing in Kurniawan's letter that merits the extraordinary protections afforded to information in the Pre-Sentencing Report, such as sensitive medical information or potentially embarrassing information about the defendant or third-parties, such as spouses or children. Sentencing memoranda and letters attached to or specifically referenced in a sentencing memorandum should generally be accessible to the public. *See United States v. King*, 10 Cr. 122 (JGK), 2012 WL 2196674 (ordering defendant to publicly file sentencing memorandum); *United States v. Roeder*, No. 05 CR 6161L, 2009 WL 385448, at *1 (W.D.N.Y. Feb. 13, 2009); *United States v. Kushner*, 349 F. Supp. 2d 892, 905-06 (D.N.J. 2005). The Court's own individual rules of practice would also seem to require the public filing of the April 25th Letter: "The Court assumes that every document in a sentencing submission, including letters, will be filed in the public record through the ECF system . . . ." (The Honorable Richard M. Berman, *Individual Rules of Practice for Criminal Case Sentencing Proceedings*, Sept. 2013, available at http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=214).

Whether the April 25th Letter is in the public record or not, the Court should not give it or any subsequent statement of remorse any credit. As set forth below, the Guidelines clearly state that when a defendant challenges his factual guilt at trial, as Kurniawan did, and he only

expresses remorse after conviction, he is not entitled to a two point reduction from the offense level:

> **This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.** Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). **In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct**.

USSG § 3E1.1 App. Note 2 (emphasis added). This is not one of the "rare situations" where a defendant has admitted his guilt before trial but proceeded to trial only to preserve an issue for appeal. *Id*. Kurniawan cannot have it both ways. He elected to go to trial when the evidence was overwhelming and he was predictably convicted. It is simply too late to express remorse and receive credit for it.

The Court should also decline to give the April 25th Letter any weight as a mitigating sentencing factor. Besides coming too late, there is a tension between Kurniawan's April 25th Letter and his sentencing submission that renders Kurniawan's purported expression of remorse totally unconvincing. In the April 25th Letter, Kurniawan writes that he "makes[s] no excuses" for what he did. Kurniawan's sentencing memorandum, however, is chock full of wholly unconvincing and blame-shifting excuses for what Kurniawan did. For example, Kurniawan asks the Court for leniency because he says he was merely trying to fit it, to rub elbows with big

15

wine collectors, to have a turn in the spotlight, and to be the center of attention. (Kurniawan Sent. Mem. at 5-9). Additional excuses include variants of the argument that there are lots of fake wines in the market anyways and that everyone knew that. (*Id.*) Worst of all, Kurniawan has the temerity to ask this Court to credit his remorsefulness when he boasts in his sentencing memorandum that he made fake wines because he "knew he could do better" than the apparently sub-par fakes in the market, that he viewed scamming others as a "challenge," and that the wines he concocted were what the in-crowd seem to want. (*Id.* at 10). Simply put, Kurniawan is not sorry for what he did, he is sorry that he was caught. The Court should thus not show Kurniawan any leniency based on an eleventh hour attempt to show remorse.

**B. The Court Should Reject Kurniawan's Other Arguments in Mitigation Because They Are Irrelevant and/or Inapposite**

Kurniawan's lengthy sentencing memorandum makes several other arguments in support for his request for a sentence of time served. He quotes, for example, a portion of the transcript from a civil case over which Judge Oetken presided in which William Koch sued Eric Greenberg for selling Mr. Koch counterfeit wines. (Kurniawan Sent. Mem. at 26-27). That civil case, however, has no bearing on the sentence that should be imposed here. Kurniawan also makes several arguments about the alleged complicity of others in the wine auction market. (*Id.* at 19-20). He even attempts to shift blame to the market by claiming that the "market" chose to accept Kurniawan's wines. (*Id.*). These arguments, which also try to shift blame away from Kurniawan, are unpersuasive because it was Kurniawan who created the fake wines that infiltrated the market. The blame falls squarely on his shoulders.

There are a number of other arguments in Kurniawan's sentencing memorandum that, in the Government's view, are not relevant to Kurniawan's sentencing. The Government respectfully

requests that the Court allow the Government to address any of those arguments at sentencing if the Court is going to give them any weight.

## VI.  The Court Should Impose A Forfeiture Money Judgment and Order Restitution

Kurniawan sold tens of millions of dollars of counterfeit wines over the course of more than a decade.  Selling wine, much of it counterfeit, was also Kurniawan's exclusive or near exclusive source of income during that period of time.  Kurniawan's current assets, while not insubstantial, do not come close to totaling what Kurniawan gained from his counterfeit wine sales. Kurniawan says that he wants to make restitution to his victims. (Kurniawan Sent. Mem. at 32). The best way to do that would be for the Court to forfeit Kurniawan's remaining assets. Accordingly, the Government respectfully submits that the Court should impose a $20,730,000 million forfeiture money judgment, forfeit all of Kurniawan's assets identified in the superseding indictment and the seizure/restraining order issued by the Court, and impose an order of restitution.[3]

---

[3] The Government will prepare and distribute to the Court and Kurniawan a proposed forfeiture order and a proposed order of restitution one week before sentencing.

## **Conclusion**

For the reasons stated above, the Court should impose a sentence within the advisory

Guideline range and impose an order of forfeiture and restitution.

Dated: New York, New York
May 12, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:  ___/s/ Jason P. Hernandez_____
JASON P. HERNANDEZ
JOSEPH P. FACCIPONTI
Assistant United States Attorneys
Tel.: 212-637-1024/2522